THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHRISTOPHER W. KEEFE, Defendant-Appellant.

First District (6th Division)   No. 1—89—0229

Opinion filed February 8, 1991.

Martin Carlson, of State Appellate Defender's Office, and Schiff, Hardin & Waite, both of Chicago (James A. Clark and Gregory R. James, Jr., of counsel), for appellant.

John O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Walter Hehner, and Kevin Hughes, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE RAKOWSKI delivered the opinion of the court:

Defendant Christopher Keefe was charged with one count of attempted first degree murder, two counts of aggravated battery, and one count of armed violence. A jury found defendant guilty of all offenses. After trial, the court granted defendant's motion for judgment of acquittal on the attempted murder charge, and ruled that the guilty verdicts on the aggravated battery counts merged for the purposes of sentencing. Subsequently, defendant was sentenced to concurrent prison terms of seven years' imprisonment and three years' mandatory supervised release on the armed violence count, and three years' imprisonment and one year's mandatory supervised release on the aggravated battery counts.

On appeal, defendant requests that this court reverse his convictions and grant him a new trial. Defendant contends: that the trial court erroneously prohibited defendant from testifying as to his state of mind at the time he was attacked; that the trial court erred in prohibiting defendant from questioning the victim and a witness about the victim's character for violence; that the State's use of a "hankie" or "bandanna," which had the appearance of a Confederate flag, prejudiced defendant and denied him a fair trial; that the trial court erred in allowing testimony about defendant's companion's possession of a knife that was similar to defendant's knife; that defendant's armed violence conviction should be reversed because it constitutes an impermissible double enhancement, or alternately, that defendant's aggravated battery conviction should be reversed because it is a lesser included offense of armed violence in this case, and the multiple convictions may not be premised on such closely related acts. We reverse and remand for a new trial.

The following facts were elicited at trial: Thomas Haller, the complainant, testified that on the evening of November 13, 1987, he had been at his home, drinking "[a] few beers" and "two or three" shots of whiskey. He was upset because someone had stolen his wallet at his house. Later that evening, he went to his friend Lorenzo Crockett's house. At about 11:30 p.m., Haller and two other friends, Ina Whalen and Willie Willis, left Crockett's house and proceeded to walk in the alley in back of Crockett's house.

Haller further testified that he was talking with his friends when a car, driven by defendant and containing one passenger, pulled up beside them. Haller was not arguing prior to the car's arrival, and Willis was not holding Haller up. Haller related that defendant pulled up

and asked him if he [Haller] had a problem. Haller replied that he did and asked defendant if defendant had a problem. Defendant said that he did not have a problem. Next, according to Haller's testimony, Willis told defendant that Haller had lost his money. The men in the car began laughing. Haller then "went up to the car and punched" defendant in the temple.

Defendant drove to the end of the alley, and then backed the car up and parked in a parking lot. Haller testified that defendant "threatened me, said he was going to kick my butt." Haller became angry again and went to the car and punched defendant a second time. Defendant was still seated in the car. After being struck a second time, defendant exited from the car and began to fight Haller.

Haller further testified that, during the altercation, defendant knocked him down. When Haller got up, defendant charged at him. While the two men were wrestling, standing chest to chest, defendant stabbed Haller twice in the back. At no time during the altercation did Haller or his friends have a weapon.

During cross-examination, defendant's counsel attempted to inquire about a statement Haller made to a doctor, indicating that Haller had been to the "hospital on several occasions because of *** injuries incurred while fighting otherwise."

Ina Whalen testified that Haller was arguing with Willie Willis about Haller's missing wallet, and that Willis was trying to calm Haller down when the car approached. Whalen stated that defendant asked if there was a problem, and that Haller then asked defendant if defendant had a problem. After Haller and defendant exchanged words, defendant parked the car. At this point Whalen, at the urging of Willis, left the area. Defense counsel attempted to ask Whalen if Haller had "threatened to fight" with someone concerning his wallet, but the trial judge disallowed the question.

Willie Willis also testified at trial. He said that he and Haller had been conversing for five minutes when defendant first approached. Haller asked defendant what he was looking at, or something to that effect. Willis corroborated Haller's account of the altercation, as to Haller punching defendant twice while defendant was in the car, defendant getting out of the car on his own power, and the two men fighting. Willis did not see the stabbing, but did see the knife in defendant's hand and noticed blood on defendant's hands. Defendant returned to his car and drove off.

Tammy Wright, a Harvey, Illinois, police officer, testified that on the night of November 13, 1987, at about 11:52 p.m., she responded to a broadcast and found Haller injured. Willie Willis told her that

one of the men in the car was a Mr. Harris, and Officer Wright put this information out to other police officers in the area. Defendant and the other occupant of the vehicle were located by Harvey police officer Billie Cantrell and were brought back to the scene for a showup. Cantrell produced two knives which she had recovered from defendant and the other passenger of the vehicle. During Wright's testimony, she identified the knives and also identified a "hankie or bandanna" which was seized from the vehicle.

Officer Wright further testified that at about 4 a.m. the next morning, defendant signed a written statement at the police station, after being advised of his *Miranda* warnings. The statement, which Wright read to the jury, provided:

"Going down the alley checking on the houses that Patty asked me to check on. Way back, saw three kids, one of them holding another, acting like he needed help. Stopped. Asked if they needed help. The white guy asked me if I had a problem. I told him no. Then, the black guy started pulling the white guy away from the car. White boy got away and hit me. I turned my car around to where it was heading east and parked it. The white boy came over to the car, opened the car door, pulled me out of it and I stabbed him one time in the back, or was it the front? I don't even know. Then I flipped him on the ground. Then he came over to try to keep the white guy from swinging at me anymore. Then the black guy held him down, and I went and got in my car and pulled away from there about a half block and waited for the police.

I am giving this statement voluntarily and no threat's been made against me to force me to give this statement."

Harvey police officer Billie Cantrell testified that she found defendant and the co-occupant of defendant's car, Zackery Harris, seated in the car about one-half block from the scene of the altercation. Harris stated that two subjects had just tried to rob them. Defendant's knife was in plain view of Cantrell in the front seat of the car. Defendant's knife was introduced into evidence, but neither the other knife (which belonged to Harris) nor the bandanna was introduced into evidence.

By way of stipulation, the following evidence was introduced: Dr. Vishnu Mathur examined Haller, at about 1 a.m. on November 14, 1987, at the Ingalls Memorial Hospital emergency room. Two stab wounds, which did not puncture any internal organs, existed at the back posterior to Haller's lower chest. Haller's blood-alcohol level was .22. Haller was discharged from the hospital on November 16, 1987.

Zackery Harris testified for defendant. Harris was a member of the South Suburban Citizens Patrol, and he and defendant were assigned to patrol on November 13, 1987. They began patrolling at about 7 p.m. that evening. At about 11:30 p.m., Harris and defendant came upon Haller and Willis, who were struggling. According to Harris, defendant asked the men if there was any problem, and Haller responded by striking defendant in the face. Harris said that neither he nor defendant laughed at Haller or Willis. After defendant was struck, he drove down the alley and parked in a parking lot, and told Harris to "get on the radio for help."

While Harris was on the radio, Haller came to the car, pulled defendant out of the car and threw defendant against the car. "[A]bout five minutes" later, Harris said, defendant got back in the car and drove away as Harris continued to call for help on the radio. When a unit of the South Suburban Citizens Patrol was contacted, defendant and Harris stayed where they were until the police arrived some five minutes later.

On cross-examination, Harris testified that he did not see defendant take out or open defendant's knife, which Harris described as a folding "army knife." Over objection, the State elicited that Harris possessed the same type of knife at the time of the incident. Harris stated that a Harvey police detective had told the members of Harris' organization that they were not to carry concealed weapons or make arrests. Harris also said that he knew that defendant had a knife. A police station was one-half block away from where the stabbing took place, Harris said.

Finally, defendant testified in his own behalf. He related that at about 11:30 p.m. that night, he saw Haller and Willis struggling in the alley. Defendant stopped his car near the men and asked if there was a problem. Haller responded "No, I haven't got a problem, but you are the problem." Defendant denied laughing when Haller said this. Defendant stated that Haller hit him on the left side of the head. Defendant then drove down the alley and parked in a parking lot which was about 10 to 15 feet from the men. Defendant directed Harris to get some help on the radio.

Then, all of a sudden, the driver-side car door opened and Haller pulled defendant out of the car and pushed defendant against the car. Haller struck defendant in the face and proceeded to choke defendant. Defendant reached into his pocket, pulled out his knife, and "cut [Haller] on his back." After this, Haller continued to try and fight, so defendant flipped Haller over his back. Because Haller was trying to kick him, defendant hit Haller twice in the face before getting back

into the car and driving away. Defendant further testified that he was unaware that his knife was in his pocket when he began patrolling that night, and he only noticed the knife when he reached into his pocket for a cigarette.

On direct examination, defendant was allowed to state that he reached for his knife because he was being strangled, but defendant was not allowed to testify as to his feelings when he was pulled from the car, and as to whether he was afraid when he was being choked.

The evidence at trial revealed that while defendant and Haller were the same height, Haller outweighed defendant by 37 pounds.

■■■ The first issue we resolve is whether it was reversible error for the trial court to prohibit defendant from testifying as to his state of mind at the time he was attacked. At trial, defendant presented a theory of self-defense. The requirements for determining whether the use of force is justified as self-defense are as follows:

> " '(1) [T]hat force is threatened against a person; (2) that the person threatened is not the aggressor; (3) that the danger of harm is imminent; (4) that the force threatened is unlawful; (5) that the person threatened must actually believe: (a) that a danger exists, (b) that the use of force is necessary to avert the danger, (c) that the kind and amount of force which he uses is necessary; and (6) that the above beliefs are reasonable.' " (*People v. Crum* (1989), 183 Ill. App. 3d 473, 482, 539 N.E.2d 196, quoting *People v. Kyles* (1980), 91 Ill. App. 3d 1019, 1021, 415 N.E.2d 499.)

(See Ill. Rev. Stat. 1987, ch. 38, par. 7—1.) The determinative question where deadly force is used is whether defendant's belief that it was necessary to use deadly force was reasonable under the circumstances. (*People v. Collins* (1989), 187 Ill. App. 3d 531, 534, 543 N.E.2d 572.) The privilege of using deadly force to protect oneself from another, if one reasonably believes he is in imminent danger of death or great bodily harm, exists even where one is mistaken or the danger is only apparent. *People v. Rodriguez* (1989), 187 Ill. App. 3d 484, 489, 543 N.E.2d 324.

■■ ■ "In criminal cases where the intention, the motive, or belief of the accused is material to the issue, he is allowed to testify directly to the fact." (*People v. Biella* (1940), 374 Ill. 87, 89, 28 N.E.2d 111.) · "[S]elf-defense necessarily involves the question of whether defendant *subjectively* believed, at the time of the incident, that the force exercised against the victim was necessary." (Emphasis in original.) (*People v. Eshaya* (1986), 144 Ill. App. 3d 757, 765, 494 N.E.2d 772.) "Where a claim of self-defense rests upon some reasonable ba-

sis, exclusion of state-of-mind testimony by a defendant will ordinarily constitute reversible error unless sufficient evidence of his intent is admitted at a subsequent stage of the trial." *People v. Christen* (1980), 82 Ill. App. 3d 192, 194, 402 N.E.2d 378.

In this case, defendant's counsel was allowed to elicit from defendant the reason that defendant took out his knife—the reason being "because [defendant] was being strangled." However, the trial court disallowed the question, "Were you afraid?" and the trial court disallowed a question relating to what defendant was feeling at the time defendant was pulled from the car. Defendant argues that as the prohibited testimony went "directly to the crucial issue" of defendant's intent, motive and belief, defendant had the right to testify to his state of mind. The trial court's error in excluding this testimony was compounded, defendant argues, by the prosecutor's comment in closing argument that "[y]ou have absolutely no evidence before you that the defendant was ever in fear for his life. He never told you that he was. He never told the police that he was. *** Therefore, him stabbing Tommy Haller in the back was not legally justified." Later in the prosecutor's argument, the prosecutor again emphasized that defendant was "not in fear of losing his life."

The State responds that defendant has waived this argument because he neither advanced this argument at trial nor included it in his post-trial motion. This court should not apply the "plain error" rule, the State argues, as the evidence was not closely balanced, and assuming error did occur, such error must be deemed harmless "in light of the overwhelming evidence of defendant's guilt."

■ In order to preserve an issue for appeal, a defendant must both make a contemporaneous objection and include it in his post-trial motion. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124.) Since defendant did not include this matter in his post-trial motion, the issue is waived for appeal.

■ ■ Under Supreme Court Rule 615(a) (107 Ill. 2d R. 615(a)), however, "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." Courts may consider plain error "where the record clearly shows *** an alleged error affecting substantial rights." (*People v. Young* (1989), 128 Ill. 2d 1, 46, 538 N.E.2d 461.) This rule serves the dual purposes of "correcting serious injustices" and preserving "the integrity and reputation of the judicial process." (*Young*, 128 Ill. 2d at 46.) Therefore, the rule applies only "when the question of guilt is close and the evidence in question might have significantly affected the outcome of the case [citations], or where the error alleged is so

substantial as to reflect on the fairness and impartiality of the trial regardless of how closely balanced the evidence is [citations]." *People v. Sanders* (1983), 99 Ill. 2d 262, 273, 457 N.E.2d 1241.

■ ■ To apply the plain error exception to the waiver rule, courts should first determine if the record plainly shows that an error affecting substantial rights was committed. (*People v. Precup* (1978), 73 Ill. 2d 7, 17, 382 N.E.2d 227.) This criterion is met in criminal cases when "the evidence is closely balanced or the error is of such a magnitude that the commission thereof denies the accused a fair and impartial trial or sentencing hearing. [Citations.]" (*Young*, 128 Ill. 2d at 47.) Thus, a reviewing court must first examine the record to find the strengths and weaknesses of evidence against the defendant, because "if the evidence is close, there is a possibility that an innocent person may have been convicted due to some error which is obvious from the record, but not properly preserved." *People v. Carlson* (1980), 79 Ill. 2d 564, 576, 402 N.E.2d 233.

Even though defendant did not raise this issue in his post-trial motion, we address the issue. As the prosecutor gave no ground for making the objections, and the trial court stated no grounds for sustaining the objections, the objections are to be treated as made and sustained on the grounds of relevancy. (*Gale v. Hoekstra* (1978), 59 Ill. App. 3d 400, 411, 375 N.E.2d 456.) It is thus clear that error here occurred. Defendant's subjective feelings when pulled from the car, and whether defendant was afraid during the altercation, are matters which are relevant to the issue of whether defendant was justified in using the force that he used. The State argues that we should not review the issue as plain error because "the evidence was not closely balanced."

■ To the contrary, we feel that the evidence was quite closely balanced in this case. At trial, the State and defendant presented conflicting stories about the altercation. The two versions of the story differed in important respects, including whether defendant got out of his car of his own volition or was pulled out of the car by Haller, and whether Haller strangled defendant or not. Both the State and defendant had a witness that corroborated their respective versions of the altercation. While the State stresses that Harris' testimony was impeached in numerous respects, we note that Haller's ability to perceive the events of that evening was suspect, as his alcohol concentration at the hospital registered .22, or more than twice the legal limit. (See Ill. Rev. Stat. 1989, ch. 95½, par. 11—501.1.) The evidence was closely balanced, and the evidence in question might have affected the outcome of the case. Due to the improper exclusion of defendant's

testimony, the jury convicted defendant without defendant being allowed to show his actual and subjective belief that he feared for his life or that he was in danger of great bodily harm. We hold that the exclusion of defendant's testimony as to his state of mind is plain error which entitles defendant to a new trial.

■■ ■ The State also makes the argument that if error did in fact occur, the error was harmless. Errors will be held harmless when they could not reasonably have affected the result or contributed to defendant's conviction. (See *People v. Carlson* (1982), 92 Ill. 2d 440, 442 N.E.2d 504.) For the reason that the exclusion of the evidence was plain error warranting a new trial, the exclusion of the evidence could have affected the result of the case and contributed to defendant's conviction. Moreover, it has been held that the emphasis in closing argument on improperly admitted evidence is a consideration in determining whether harmless error has occurred. (See *People v. Anderson* (1986), 113 Ill. 2d 1, 495 N.E.2d 485.) Here, the prosecutor repeatedly emphasized the improperly excluded evidence during closing argument. The prosecutor told the jury that defendant was not justified in using the force defendant did unless defendant feared for his life. Not only did this emphasize the improperly excluded evidence, but it also was a clear misstatement of the law. Defendant could justifiably avail himself of the use of deadly force if he either reasonably feared for his life, or reasonably believed he was in imminent danger of great bodily harm. In conclusion, the error of excluding defendant's testimony as to his state of mind at the time of the altercation was not harmless error.

Although not necessary to dispose of this case, we will address two further issues as they are likely to recur upon remand. Defendant further contends that the trial court erred in prohibiting defendant from eliciting testimony relating to Haller's character for violence.

■■ It is generally a defendant's right to present evidence of a victim's character for violence when the defendant alleges that he acted in self-defense against the victim. "[T]he reason for the rule is that such evidence tends to show circumstances confronting the defendant, the extent of his apparent danger, and the motive influencing him." (*People v. Robinson* (1987), 163 Ill. App. 3d 754, 773, 516 N.E.2d 1292.) In this case, the trial court prohibited the questioning of Haller regarding his "fighting otherwise" statement at the hospital, and prohibited the questioning of both Haller and Ina Whalen as to whether Haller had been fighting or trying to fight the evening of the stabbing, before the altercation with defendant. The trial court disallowed such testimony on the grounds that evidence of the vic-

tim's violent character was admissible only in homicide cases and was irrelevant because, in this case, the evidence was apparent and undisputed that Haller was the initial aggressor.

■ Defendant correctly asserts, and the State does not now dispute, that evidence of a victim's violent character may be admitted in battery cases where self-defense is at issue. (See *People v. Jones* (1976), 37 Ill. App. 3d 879, 882, 346 N.E.2d 389.) As to the issue of whether such evidence was irrelevant here because it was undisputed that Haller was the aggressor, the parties focus on the Illinois Supreme Court case of *People v. Lynch* (1984), 104 Ill. 2d 194, 470 N.E.2d 1018. In *Lynch*, the court explained:

"A victim's aggressive and violent character may tend to support a theory of self-defense in two ways. First, the defendant's knowledge of the victim's violent tendencies necessarily affects his perceptions of and reactions to the victim's behavior. The same deadly force that would be unreasonable in an altercation with a presumably peaceful citizen may be reasonable in response to similar behavior by a man of known violent and aggressive tendencies. One can only consider facts one knows, however, and evidence of the victim's character is irrelevant to this theory of self-defense unless the defendant knew of the victim's violent nature ***.

Second, evidence of the victim's propensity for violence tends to support the defendant's version of the facts where there are conflicting accounts of what happened. In this situation, whether the defendant knew of this evidence at the time of the event is irrelevant." (*Lynch*, 104 Ill. 2d at 199-200.)

The court concluded "[w]e hold that when the theory of self-defense is raised, the victim's aggressive and violent character is relevant to show who was the aggressor, and the defendant may show it by appropriate evidence, regardless of when he learned of it." *Lynch*, 104 Ill. 2d at 200.

The State argues that the trial court was correct in excluding the evidence of Haller's aggressive or violent propensities, as it was undisputed that Haller was the aggressor, and, as it relates to this case, *Lynch* authorizes such evidence only for the purpose of showing who was the aggressor. Defendant, on the other hand, seizes the "conflicting accounts" language of *Lynch* in arguing that the evidence of Haller's aggressive and violent character was relevant to support defendant's version of what happened in this case and to support the conclusion that Haller remained the aggressor. It is clear that *Lynch*

involved the question of who was the aggressor, and the court limited its holding to that issue.

It is not clear from a reading of *Lynch*, however, that such evidence may only be relevant, as the State argues, to who threw the first punch in this case. The evidence in this case reveals that there was a question as to who was the aggressor *at the time of the stabbing*, as there were conflicting accounts as to the circumstances of the stabbing. Moreover, although the parties have not discussed the case, there is authority which supports other use of such evidence. In *People v. Gossett* (1983), 115 Ill. App. 3d 655, 665-66, 451 N.E.2d 280, the court observed "[i]n addition to being probative of the question of aggression, the offers excluded here would have provided testimony which, if believed by the jury, would have also rendered reasonable the defendant's use of *deadly* force against the deceased. It is one thing for the jury to accept the fact of the deceased's aggression; it is another for the jury to find the defendant was justified in using the *amount* of force he did." (Emphasis in original.)

■■■ The State does not contend that defendant has waived this issue. The State's sole arguments are that *Lynch* does not authorize the evidence of Haller's violent and aggressive character and that, if the exclusion of this evidence was error, it was harmless error. In this case, the exclusion of evidence of Haller's violent propensities was error. Haller admitted, without objection, that he had tried to fight earlier in the evening. Defendant should have been allowed to develop this testimony, as it clearly was probative on the issues involved in this case. Defendant also should have been allowed to delve into Haller's statement that he had been to the hospital for "fighting otherwise." The only reasonable inference from this statement is that Haller had some history of engaging in fights. Had defendant been allowed to present this relevant evidence to the jury, it is possible that the jury would have given greater weight to defendant's version of the events of that evening or concluded that defendant was justified in using the amount of force that he did. In light of the other errors that occurred at trial, it cannot be said that the trial court's prohibition of testimony concerning Haller's violent and aggressive character was harmless error.

The last issue that we discuss relates to the State's use at trial of a piece of cloth which, as the trial judge observed and the State does not dispute, had "the effect of a flag," the imprint being that of the Confederate flag. Attached to defendant's motion for a new trial were the affidavits of two jurors who stated that they took the material to be a Confederate flag and thought it was introduced into evidence. This item was apparently recovered from Harris the evening of the

occurrence and was shown to Officer Wright at trial, and placed in a clear plastic bag on the counsel table during trial. Defense counsel stated that she never received this item before trial, and did not observe it on the counsel table at trial, or observe it when it was shown to Officer Wright during Officer Wright's testimony. The State asserts, and defendant does not in its briefs dispute, that the State, in response to pretrial discovery, answered that all items inventoried would be used at trial. The State, moreover, asserted at argument on defendant's motion for a new trial that defense counsel had seen the "flag" prior to trial. Regardless, defendant makes no argument that any discovery violation entitles him to a new trial.

Defendant's position on this issue is that the Confederate flag is a symbol of racial animosity, analogous to a swastika. Defendant argues "[t]his court has not hesitated to impose the sanction of a new trial where a prosecutor unfairly injects irrelevant and highly prejudicial issues of race into the trial process," citing a number of cases which involve a prosecutor's verbal references to a defendant's or witnesses' race when race was irrelevant to the issues at trial.

The State argues that, as defendant did not raise an objection to the presence of or use of the cloth at trial, the issue is now waived. The State also argues that the cloth was used for proper purposes at trial, namely that Harris saw defendant wipe the blood from his hands on the cloth, thereby discrediting Harris' testimony they he did not see blood on defendant's hands, and also to "prove the integrity of the inventory of evidence" at the scene and that the chain of custody was fulfilled.

For the purposes of resolving this issue, we need not decide that the use of the "flag" was error because it is a symbol of prejudice akin to a swastika. The reason we need not go so far is that a review of the record reveals the evidence to be completely irrelevant to the issues at trial. The State argues that at trial it attempted to discredit Harris' testimony that he didn't see defendant wipe his hands of blood, and seems to suggest that defendant may have wiped his hands or his knife on the cloth. The State never asked Harris if the cloth was used for this purpose. The State did not confront defendant with this contention. We have observed the cloth and did not see stains resembling blood. The State has not presented any evidence of physical tests or direct testimony to indicate that defendant wiped his hands or his knife on the cloth. Likewise, the State's contention that the cloth was used to prove the integrity of the inventory process and show chain of custody is also not reflected in the record. Inventorying procedures were never challenged at trial, nor was the chain of cus-

758

tody challenged. Such were sufficiently established by the introduction of defendant's knife into evidence.

■■■ In order for evidence to be admissible, the evidence must be relevant. (*People v. Molsby* (1978), 66 Ill. App. 3d 647, 657-58, 383 N.E.2d 1336.) Here, the cloth bearing the imprint of the Confederate flag was irrelevant, and its use at trial was error. While its use at trial may not, alone, have constituted reversible error, when coupled with the other errors at trial, it was not harmless.

Based upon the foregoing, we need not address the other issues defendant raises.

Accordingly, the judgment of the circuit court is reversed and remanded for a new trial.

Reversed and remanded.

McNAMARA AND LaPORTA, JJ., concur.